Frank Champion and Flora L. Champion v. Commissioner.
Champion v. Commissioner
Docket No. 64435.
United States Tax Court
T.C. Memo 1960-51; 1960 Tax Ct. Memo LEXIS 241; 19 T.C.M. (CCH) 253; T.C.M. (RIA) 60051; March 24, 1960
Dougal C. Pope, Esq., for the petitioners. David E. Mills, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies *242 in petitioners' income tax of $3,358.94 and $177,096.56 for the years 1951 and 1952, respectively. The issues to be decided are: 1. Whether $11,225 received by petitioners in 1951 from the sale of certain stock constituted a short-term capital gain or ordinary income. 2. Whether petitioners received stock in July 1951, which they exchanged for 50,000 shares of similar stock, or any part thereof, in 1952 so as to give rise to a nontaxable transaction under section 112(b)(2), I.R.C. 1939, and, if not, what was the fair market value of the stock when it was received? 3. Whether the fair market value of 10,000 shares of stock concededly acquired by petitioners in 1952 exceeded $1the per share paid for it under an option agreement, and, if so, whether the excess constitutes income received by petitioners in 1952. 4. Whether, and in what amount, petitioners are entitled to deductions for travel and entertainment in 1951 and 1952. Findings of Fact The stipulated facts are found. Petitioners are husband and wife residing in Houston, Texas. They filed joint income tax returns for the years 1951 and 1952 with the director of internal revenue at Austin, Texas. The Texas-Ohio *243 Gas Company, Inc., hereafter called Texas-Ohio, was incorporated under the laws of Delaware on May 14, 1951, with an authorized capital stock of 600,000 shares having a par value of 50 cents per share. On May 17, 1951, stock certificates Nos. 1 and 2 for 380,000 shares and 220,000 shares, respectively, were issued to "Clyde Austin, Trustee." On July 17, 1951, Frank Champion, hereafter called petitioner, entered into an agreement with Texas-Ohio which provided: "[You] shall receive for services rendered and to be rendered * * * 15% of the Capital Stock of Texas-Ohio Gas Corporation and the right to purchase an additional * * * 10% at the opening price when placed upon the market by the Investment Bankers, simultaneously to when issuance of all the stock represented by the various interests will be issued and made of record. "For this consideration you agree to take over the management of this Corporation, subject to approval of the Board of Directors, and with the consultation of the parties herein select a Board of Directors from which an Executive Committee will be appointed to operate under, and all stock involved in this transaction will be placed in a voting trust under *244 which the Executive Committee will have the authority to operate. All stock owned by individuals shall bear its prorata cost of major financing. "Subject to the above you will obtain the interim financing necessary to complete the preliminary operations of Texas-Ohio Gas Corporation in obtaining a certificate of Convenience and Necessity from the F.P.C. and will attempt to purchase for the Company the remaining necessary gas. "At the appropriate time in the very near future a letter of agreement in detail will be drafted to this effect, but in the interim this will serve as a mutual contract. The present contracts made by Texas-Ohio Gas Corporation on gas, insurance, steel, Ferguson, Milton Underwood, pipe line, stringing, already committed by the present organization will be accepted subject to economic consideration and approval of F.P.C. and Banking Interests. "You shall assume the position of Chairman of the Board and Chairman of Executive Committee and Director." This agreement was executed in behalf of Texas-Ohio by T. B. Hoffer, President, L. E. Reed, Vice-President, J. R. McAuliffe, Secretary-Treasurer, and Cecil H. McLain, Harry T. McLain and Clyde Austin, stockholders. *245 The voting trust provision of the agreement was never effectuated. The minutes of a meeting of Texas-Ohio's board of directors held on July 27, 1951, recite that: "Mr. Clyde Austin was invited into the meeting. He stated that he was turning into the company for cancellation and reissue Stock Certificate Nos. 1 and 2 in the amount of 380,000 shares and 220,000 shares respectively, and that he was filing a letter of instructions with the Secretary of the Company to that effect. He stated that as the directors knew, an agreement had been arrived at with Mr. Frank Champion, under which Mr. Champion would come into the company, bringing with him strength and resources which the company needed. He said that it had been agreed among all parties that Certificate No. 1 should be reissued to Clyde Austin and Frank Champion, Trustees, to be held by them for future developments, to their own benefit and the benefit of others who contributed to the organizational development of the company, as their several interests might appear, such being the agreement with Mr. Champion. "Mr. Austin stated that in accordance with a contract which had been entered into between the company and Valley Gas *246 Pipe Line Co., Inc., a Delaware corporation, dated June 19, 1951, 59,999 shares out of Certificate No. 2 should be issued to J. Leslie Witt and Earl E. Beyer, Trustees; and that he is asking that the balance of said Certificate No. 2, in the amount of 160,001 shares, be held subject to future order of Mr. Champion and himself. "Mr. Reed moved that the Board of Directors express their approval of Mr. Austin's action in this whole matter, and Mr. McAuliffe seconded the motion, which was unanimously adopted." On July 27, 1951, stock certificate No. 1 was canceled and the 380,000 shares of stock covered by that certificate were reissued as certificate No. 3 to "Clyde Austin and Frank Champion, Trustees." Petitioner insisted the balance of the stock be made "into" a trustee so it would not be dispersed and oversold. He was distrustful of Mr. Austin's commitments. On November 20, 1951, Joseph W. Hibben, a partner in Kidder, Peabody & Co., an investment banking firm with which petitioner had been negotiating with respect to financing the company, sent the following telegram to Albert H. Gordon, another partner in Kidder, Peabody & Co., concerning the purchase of 200,000 shares of Texas-Ohio *247 stock: "Gas situation substantially as reported. Contract terms amount acreage price, etc., have been agreed to during months of negotiation. Sellers are holding contracts pending proof of financial support and evidence that sufficient gas had been accumulated to warrant construction. Letters are held on easily 350 million. Only those ready to sign final contract form have been tabulated in summary we have. Many of them are pushing the company for action including certain major companies. "I believe we should proceed with enthusiasm and dispatch rather than doubt and delay accordingly as agreed I have purchased for Kidder-Peabody Associates including certain dealers 50,000 shares of Texas-Ohio stock at.50" per share from present stockholders. I have firmly agreed to buy 50,000 shares at $2.00 per share from the company immediately upon it being contributed to the company by present holders and I have optioned 100,000 shares at $2.00 per share on same basis for 90 days but not longer than 5 days after Ralph E. Davis report is received by Kidder-Peabody showing Texas-Ohio controls gas acreage with daily deliverability of at least 330 million cubic feet backed by reserves of at least *248 3 billion, 300 hundred million cubic feet. All above stock to be validly issued and transferred to us as a part of 600,000 shares total. "Texas-Ohio is now sending us letter appointing Kidder-Peabody Agents for placement of debt and authorizing us to form underwriting group. Champion needs our held and requests wire today addressed to Frank Champion, President, Texas-Ohio Gas Company, 2115 Glennhaven, Houston Texas * * *." On November 21, 1951, Kidder, Peabody & Co. sent the following telegram to petitioner as president of Texas-Ohio: "Kidder-Peabody Associates and other have subscribed and are ready to pay for the stock you offered for cash. We expect to invest additional amounts for engineering and other expenses involved in prosecuting the F.P.C. application as soon as favorable reserve report is ready and to organize a nationwide group of investment dealers for the purpose of distributing the securities required to finance the line. We will confirm the above arrangement with any producer of gas upon request." At a meeting of the board of directors of Texas-Ohio on December 8, 1951, after consideration of the offer from Kidder, Peabody & Co. to purchase stock, the following *249 resolution was unanimously adopted: "RESOLVED that Texas-Ohio Gas Company accept the offer of Kidder, Peabody & Co. to purchase from the corporation 50,000 shares of Treasury Stock at $2.00 cash per share, and the officers of this corporation are specifically authorized and directed to carry out the provisions of such sale and purchase in such manner as they in their discretion deem appropriate upon payment to said officers for delivery to the corporation the sum of $100,000.00, and said officers are hereby fully authorized and instructed to do any and all things proper and necessary to carry such sale of Treasury Stock into effect. "RESOLVED FURTHER that the proper officers of said company be authorized at the same time the above sale of stock is consummated to execute and deliver on behalf of said corporation, to Kidder, Peabody & Co. a written option to purchase an additional 100,000 shares of the Treasury stock of this corporation at $2.00 per share, said option to be exercised within ninety (90) days from November 21, 1951, or five (5) days after the Ralph E. Davis report is received by Kidder, Peabody & Co. showing that Texas-Ohio Gas Company controls gas acreage with a daily *250 deliverability of at lease 330,000,000 cubic feet backed by reserves of at least 3,300,000,000 m.c.f. whichever occurs sooner. That said written agreement shall be entered into upon such terms and conditions and shall contain such provisions as the officers of this corporation may deem proper, and they are hereby fully authorized and instructed to do any and all things proper and necessary to carry same into effect." The minutes of the same meeting recite that: "Mr. Austin appeared before the meeting and stated that he and Mr. Champion were turning in to the Secretary of the Company for cancellation and reissue Certificate No. 3, dated July 27, 1951, for 380,000 shares of common stock in the company, with the request that 50,000 shares therefrom be reissued directly to Kidder, Peabody & Co., and the balance be reissued to Mr. Champion and himself as Trustees. He stated that this 50,000 shares to Kidder-Peabody & Co. was going direct to that firm from Mr. Champion and himself at par, and was over and above the Kidder, Peabody & Co. transaction that had just been approved by the Board on behalf of the Company. "Mr. Austin then called attention to the fact that under date of July *251 17 he and Mr. Champion had left a credit of 160,001 shares of common stock with the Secretary of the company subject to their order, and that he and Mr. Champion now requested that this 160,001 shares of stock be turned in to the Treasury of the company, earmarked for Kidder, Peabody & Co., in accordance with the company's agreement with that company, and for such other purposes as the Board of Directors might determine upon." The board of directors voted approval of the transaction between Austin and petitioner and Kidder, Peabody & Co., and on December 10, 1951, certificate No. 3 in the amount of 380,000 shares was canceled and that stock was reissued as certificates Nos. 9 and 10 in the respective amounts of 50,000 shares and 330,000 shares; the former being issued to Kidder, Peabody & Co., the latter to "Clyde Austin and Frank Champion, Trustees." Petitioner received $11,225 from the December 10, 1951 transfer of stock to Kidder, Peabody & Co.
On April 4, 1952, stock certificate No. 42, representing 5,000 shares of Texas-Ohio stock, was issued to petitioner. This stock was issued out of the stock represented by certificate No. 2 for 220,000 shares which Clyde Austin had returned *252 to the company on July 27, 1951. On April 9, 1952, petitioner sold these 5,000 shares to Harold E. Wood for a net gain of $30,000. Petitioner paid Texas-Ohio 50 cents per share for this stock. He placed $27,500 of the sales proceeds in a separate account "for the welfare of the company." In May 1952, Clyde Austin gave petitioner $15,000 for 3,000 shares of Texas-Ohio which were to be delivered by petitioner to someone whom Austin would designate on some date subsequent to the time when Texas-Ohio received a permit from the Federal Power Commission. On June 18, 1952, Joseph Hibben for Kidder, Peabody & Co., and Carl Brown for Laurence M. Marks & Co., and another investment banking firm, entered into a letter agreement with Frank Champion, as president of Texas-Ohio and for himself, which provided: "As you know from our discussions of the last few days, we desire to rescind our purchase of 150,000 shares of common stock from your company and 50,000 shares from Messrs. Frank Champion and Clyde Austin, and we are prepared to tender such shares in exchange for the return of our previous payments totaling $325,000. However, at your request, we are willing to provide you with two weeks *253 to repurchase or provide a purchaser for said shares, and it is understood and agreed that the interim arrangement herein outlined is solely for the purpose of conserving the assets of the Company during such period, and shall not be construed or deemed to constitute a waiver or release by any party hereto of any rights against any other person or persons, whether or not a party hereto. With this in mind we propose an agreement as follows: "We agree, on behalf of the respective owners of said 200,000 shares of common stock of the Company that, so long as the other parties hereto are fully complying with all the terms hereof, we will not exercise any rights we may have against the Company or Mr. Champion prior to 12 o'clock noon on July 2, 1952, provided that the Company and Mr. Champion at all times shall diligently endeavor to obtain a purchaser for said 200,000 shares of common stock at its original purchase price of $325,000. "The Company and Mr. Champion agree as follows with respect to said period to 12 o'clock noon on July 2, 1952: (1) No action will be taken to recognize claims with respect to the 330,000 shares of common stock of the Company held by Messrs. Champion and *254 Austin as Trustees, and the certificates representing said shares shall be promptly surrendered to the Company for reissue to Mr. Hoffer and Mr. Hull, as Trustees. * * *
(5) Mr. Champion is to deposit promptly in the Company's regular bank account the net proceeds of $27,500. received by him for the benefit of the Company from the sale of 5,000 shares of stock to Harold E. Wood. (6) All efforts shall be made to induce Mr. Austin to deposit promply in the Company's regular bank account $27,500 of the proceeds from the sale for the benefit of the Company of 5,000 shares of stock to Harold E. Wood. (7) The credit on the books of the Company for the benefit of Messrs. Champion and Austin in connection with the 150,000 shares of Treasury Stock sold to the purchasers referred to above is to be cancelled. * * *
(11) All parties shall cooperate with Arthur Anderson & Co. and furnish all records and other data required by them for a complete audit of affairs of the Company, and all persons known by the Company to have any claims (for expenditures, personal services or otherwise) against the Company shall be promptly notified to submit proper data with respect thereto to *255 Arthur Anderson & Co., Houston office, by 10 a.m. on June 23, 1952. "The Company and Mr. Champion shall be relieved from all obligations under this agreement upon their delivery of a certified or bank Cashier's Check in the amount of $325,000 to The Second National Bank of Houston, payable to the order of, Kidder, Peabody & Co., at any time during said two-week period. * * *
The minutes of a meeting of the board of directors of Texas-Ohio, held on August 5, 1952, recite: * * *
"Mr. Champion called attention to the fact that when he originally came with the company in July 1951, he entered into an agreement under which he was to receive 90,000 shares of the stock of the company, fully paid in and non-assessable, for his services in the organization and development of the company, together with an option to buy an [additional] 10 percent of common stock in the company, or 60,000 shares. He presented the original of an agreement to this effect, dated July 17, 1951, signed by Texas-Ohio Gas Company and the several officers and stockholders of the company who at that time were of record. He requested that this agreement be spread on the Minutes of the meeting. "Mr. Champion *256 then stated that, as is well known to the directors, it had become necessary to make a readjustment of provisions for distribution of the stock of the company, under circumstances which developed after he had given upward of a year of full time service to the company. He made certain suggestions in this connection and the situation was discussed by the directors. "Thereupon Mr. Hull moved that 50,000 shares of the original stock of the company be confirmed in Mr. Champion as of the date of his original agreement with the company, that is to say July/7 [sic], 1951, upon condition that Mr. Champion make no further claim to stock based upon said agreement, and that said issue of 50,000 shares of stock to him be in full consideration for one year of his service to the company, said year to be considered as having been completed on the first day of July, 1952; it being further provided that Mr. Champion, at his own option, might consider the sale of certain stock of the company to Harold E. Wood, from the proceeds of which sale Mr. Champion has held in abeyance to the credit of the company the sum of $27,500, as a sale from said allocation of 50,000 shares of stock to him, and upon *257 that condition might withdraw from the company said sum of $27,500; it also being provided that this allocation of stock be not in prejudice of any option which may at any time be extended to Mr. Champion for the further purchase of stock of the Company." * * *
On August 12, 1952, petitioner executed a memorandum regarding the stock readjustment of Texas-Ohio which provides: "This memorandum of stock readjustment of Texas-Ohio Gas Company is intended to be a final statement of policy and interest in the light of the settlement which has been made with Clyde Austin, individually and as trustee. "The theory of the situation is as follows: The consideration of $300,000.00 purported to have been paid into the company by Clyde Austin, against which the entire authorized capital stock of the company was credited to Austin, and upon which proposition subsequent stock transactions were based, failed as of May 28, 1952, at which time it developed that the deposit claimed by Clyde Austin had not been made. "Thereupon it became apparent that the sum of $300,000.00 cash paid into the company by Kidder, Peabody & Co., in so far as cash is concerned was actual payment for all of the *258 capital stock of the company, 600,000 shares at 50 cents par value. Kidder, Peabody & Co., agreed, however, that services and intangible assets contributed to the development of the company down to this date, should and would be recognized, and agreed that certain issues of stock and obligations for stock would be honored, chargeable against the total stock of the company paid for by Kidder, Peabody & Co., as above stated. "The stock to be recognized and now outstanding or to be issued, is as follows: "J. Leslie Witt and E. E.
Beyer, Trustees for the so-
called Valley Gas Group
59,999 shares
Harold E. Wood
10,000 shares
Frank Champion
45,000 shares
Clyde Austin, Trustee
5,000 shares
W. R. Flocks, Trustee
65,000 shares
T. B. Hoffer
10,000 shares
J. R. McAuliffe
10,000 shares
With the following options to
be recognized: W. R. Flocks, Trustee
25,000 shares
Harold E. Wood
7,000 shares
Company personnel
35,000 shares
Frank Champion (Hoffer and
McAuliffe)
40,000 shares "It is understood that all stock optioned remains in the account of Kidder, Peabody & Co., until paid for at $1.00 per share into the treasury of the company, and that all options *259 expire one-half in 45 days from the first day of August, 1952, and the other half in 90 days from the first day of August, 1952; it being further provided that any option not taken up within said time limits be extended for an additional ten (10) days after its expiration to Frank Champion and Vernon B. Lowery, or either of them, and if not taken up by them within said ten days revert to the treasury of the company. It is noted that this division of stock leaves a net of 305,001 shares in the banking group - Kidder, Peabody & Co., Laurence M. Marks and Harold E. Wood. "It is further understood that in consideration of these stock adjustments all parties, including Texas-Ohio Gas Company mutually acquit all other parties of any and all claims growing out of stock transactions. "Texas-Ohio Gas Company recommends that a limited increase of the capital stock of the company from 600,000 to 750,000 shares be immediately effectuated." On August 7, 1952, stock certificate No. 81 was issued to Frank Champion for 65,000 shares and was earmarked for Frank Champion, T.B. Hoffer, and J. R. McAuliffe to be divided between them as agreed. On September 15, 1952, petitioner exercised his option *260 to purchase additional shares at $1 per share. Certificates Nos. 120 and 121 in the amounts of 5,000 shares each were issued to petitioner for which he paid Texas-Ohio $10,000. Crockett & Company, a partnership in Houston, Texas, dealing in over-the-counter market of unlisted securities, hereafter called Crockett, dealt in transactions with Texas-Ohio stock during the year 1952. In making a market in Texas-Ohio stock, Crockett maintained a firm bid and firm offering price. During February, March, and April of 1952, Crockett engaged in sales of Texas-Ohio stock at prices in excess of $6 per share. For the period from April 24 to August 28, the price fluctuated between $4 August 8 when 100 shares were acquired by Crockett at $3.75 a share. From August 28 to September 8, the price fluctuated between $3 and $4 a share, but on the latter date rose to $6.25 a share. From September 8 through November 5, the price fluctuated between $4 and $6 a share. On August 7, 1952, no sales of stock were listed by Crockett. On August 4, 1952, Crockett purchased 500 shares of Texas-Ohio at $4 a share and sold those shares at $4.25 a share on the same day. On August 8, Crockett purchased 100 shares of *261 Texas-Ohio at $3.75 a share and sold them on the same day at $4.25 a share. Also on August 8, 1952, Crockett purchased 200 shares of Texas-Ohio at $4 a share and sold them on the same day at $4.25 a share. On August 11, Crockett purchased 3,800 shares of Texas-Ohio stock from Clyde Austin at $4.75 a share and sold 3,700 shares to various individuals on that day at $5 per share. On September 15, 1952, when petitioner acquired 10,000 additional shares of Texas-Ohio at $1 per share, the records of Crockett show a purchase and sale of 1,000 shares at $5.125 a share, and the purchase of an additional 1,100 shares at $5.25 a share, and one purchase of 250 shares at $4.50 per share. During September 1952, Glenn Davidson, a certified public accountant and secretary of Texas-Ohio, purchased 4,000 shares of Texas-Ohio at $5 per share. Respondent determined, with respect to the year 1951, that the amount of $11,225 received by petitioner for stock sold to Kidder, Peabody & Co. was taxable to petitioners as ordinary income. Respondent further determined that petitioner received 50,000 shares of the capital stock of Texas-Ohio during the year 1952 for services rendered to that company and that *262 he realized income to the extent of the fair market value of the 50,000 shares. Respondent determined that the net proceeds from the sale of 5,000 shares of stock in April 1952, and from the sale of 3,000 shares in May 1952, established their fair market value, and that on August 8, 1952, when petitioner received the remaining 42,000 shares of his 50,000 shares the fair market value of the stock was $4 a share. Respondent further determined that petitioner realized income to the extent of the difference between the fair market value of the 10,000 shares purchased on September 15, 1952, and their cost to petitioner under the option. Respondent determined the fair market value at the date of purchase of these shares to be $4.87 a share. The purpose of Texas-Ohio was to build a gas pipe line from Mexico to Ohio and a permit from the Federal Power Commission was a prerequisite. Negotiations over such a permit were carried on with the Federal Power Commission from the latter part of 1951 until 1953. In attempting to secure the issuance of this permit petitioner did some traveling. Texas-Ohio paid petitioner's "airport" or train expenses and his hotel expenses but entertainment expenses *263 were paid by petitioner. Petitioner made 4 or 5 trips to Washington in the latter part of 1951. In 1951 he went to Midland, Texas, Dallas, Texas, Los Angeles, California, San Antonio, Texas, and Denver, Colorado, in an attempt to purchase gas for the pipe line. He was away from home approximately half of the time in 1951. When he entertained, his party consisted of 5 to 12 or 14 persons. They ate at high-priced places where the cost could run $10 to $20 per person. In 1952, petitioner was in New York, Washington, Dallas, Mexico City, West Texas and various places on corporate business. He was away from home half of the year and his dining habits were similar to those in 1951. The money spent for entertainment in connection with company business in 1952 runs into a substantial figure. On their income tax returns for the years 1951 and 1952, petitioners claimed travel and entertainment expenses in the respective amounts of $8,446.92 and $9,817.64. Respondent determined that $6,273.46 of the claimed expenses for the year 1951, and all of the claimed expenses for the year 1952, did not constitute deductible expenses. It is stipulated that petitioners' capital loss carryover from *264 1950 to 1951 is $21,629.19 and that this capital loss is available for the years 1951 and 1952. Opinion That the record in this proceeding should be confusing, hazy and somewhat contradictory is not surprising. The occurrences themselves and the contemporaneous actions of the parties were generally of that nature. Stock was issued for a presumed consideration which was never paid; stock certificates were issued in certain names and reissued in others, and it is probable that what appeared to be today's developments was nullified by tomorrow's. Nevertheless, some of the actions and statements were apparently definitive enough to give a general flavor to the transactions. Certainly petitioner, upon whom lay this burden, was required to refute them in order to succeed. The basic question here is whether petitioner received 90,000 shares of Texas-Ohio stock on July 27, 1951. The record is far from being lucid. It appears to us, however, that the following summary is an accurate description of the facts which the present record shows. Petitioner entered into the employment of Texas-Ohio under a contract dated July 17, 1951. The contract provided that he was to receive, as compensation *265 for his services, 15 per cent of the company's capital stock and an additional option to purchase 10 per cent more stock. When Texas-Ohio was organized, Clyde Austin, one of the promoters, had purportedly paid into the company $300,000 as consideration for 600,000 shares of the authorized capital stock, par value 50 cents. The entire authorized capital stock was issued to him as trustee. Later developments proved that Austin had not paid the $300,000 subsequently paid by Kidder, Peabody & Co., an investment banking firm, was the only cash paid into the company for its capital stock. The persons entering into transactions with Texas-Ohio prior to May 28, 1952 had no knowledge of the failure of payment by Austin, and they acted under the erroneous assumption that Austin had paid full value for the entire capital stock of Texas-Ohio. On July 27, 1951, 380,000 shares of Texas-Ohio stock were issued to Austin and petitiner as trustees in accordance with an agreement reached by them and the board of directors that the stock was "to be held by them for future developments, to their own benefit and the benefit of others who contributed to the organizational development of the company [1] *266 * * *." Petitioner and Kidder, Peabody & Co., which was planning to handle the sale of Texas-Ohio stock, insisted on having the stock held in trust to avoid having it dispersed and oversold. On December 10, 1951, as a part of a financing arrangement between Texas-Ohio and Kidder, Peabody & Co., Kidder, Peabody & Co. purchased 50,000 shares of Texas-Ohio stock at 50 cents a share. These shares were carved from the 380,000 shares of stock held by Austin and petitioner as trustees and the sale met the approval of the board of directors. The certificate representing the 380,000 shares of stock was canceled and in its place two new certificates were issued, one to Kidder, Peabody & Co. and the other to Austin and petitioner, again as trustees, in amounts of 50,000 and 330,000 shares, respectively. The *267 $25,000 received from the sale of the 50,000 shares went to Austin and petitioner and possibly some other undisclosed individuals; petitioner received $11,225. On April 4, 1952, 5,000 shares of Texas-Ohio stock were issued to petitioner. On April 9, 1952, he sold these shares to Harold Wood, an investment banker. This sale was presumably made on behalf of the company, for at least $27,500 of the $30,000 received by petitioner from the sale was held by him in a special account, apparently for the company. In May 1952, petitioner received $15,000 from Austin and was to deliver 3,000 shares of stock to a recipient to be named by Austin. The $300,000 cash paid into Texas-Ohio by Kidder, Peabody & Co. was, insofar as cash was concerned, all of the payment for the capital stock of the company. Kidder, Peabody & Co. agreed, however, that the services and intangible assets contributed for the development of the company up until August 1952 would be recognized, and it agreed that certain issues of stock and obligations for stock would be honored and chargeable against the total stock of the company paid for by Kidder, Peabody & Co.
On August 5, 1952, the board of directors of Texas-Ohio, *268 in accordance with the agreement with Kidder, Peabody & Co., took action with respect to the stock distribution. In regard to petitioner, this action provided that he was to receive 50,000 shares of the original stock of the company which was to be "in full consideration for one year of his service to the company, said year to be considered as having been completed on the first day of July, 1952." It was further provided that petitioner, at his option, might consider the April 9, 1952 sale of 5,000 shares as a sale from the 50,000 shares of stock allocated to him. Furthermore, petitioner was granted an option to purchase 10,000 shares of Texas-Ohio stock at $1 per share, which option he exercised on September 15, 1952. Petitioner was issued 45,000 shares of Texas-Ohio stock on August 7, 1952, pursuant to the agreement of the board of directors as to the distribution of the company's stock. Texas-Ohio's exact financial condition during the years in issue is not disclosed by the record, but it apparently controlled gas acreage with a daily deliverability of some billions of cubic feet of gas. Its stock was selling over-the-counter at from $2 to $6 a share. The foregoing is the *269 only information which we have in regard to the possible issuance of 90,000 shares of stock to petitioner in July 1951. There is nothing in either the employment agreement entered into by petitioner and Texas-Ohio or the minutes of that company's directors' meeting to indicate that petitioner actually received an immediate beneficial interest in any shares in July 1951. In deciding the pivotal question we find it unnecessary to decide whether Texas-Ohio could have issued its stock to petitioner on July 27, 1951, cf. Del. Const., art. 9, sec. 3, [2] or whether 90,000 shares were placed in trust or otherwise withheld from petitioner so as to preclude his immediate possession and enjoyment of those shares. Cf. Fred C. Hall, 15 T.C. 195, affirmed per curiam (C.A. 9) 194 F. 2d 538. It suffices to say that petitioner has not proved that he acquired any proprietary interest in Texas-Ohio on July 27, 1951, and, more particularly, a 15 per cent interest. La Motte T. Cohu, 8 T.C. 796. *270 The main argument in petitioner's behalf is directed toward refuting the possibility that 90,000 of the 380,000 shares were issued in trust. He contends that the only evidence of a trust aside from the designation on the stock certificate is the July 27, 1951 minutes of Texas-Ohio's board of directors' meeting, and that this evidence is insufficient to show the existence of a trust because the purported beneficiaries and their interests are not indicated with reasonable certainty, citing Kurtz v. Robinson, 279 S.W. 2d 949 (Civ. App., Texas). Petitioner concludes that: "Since there was no trust created on July 27, 1951, then the Petitioner would have received the 90,000 shares of stock on July 27, 1951, as compensation for services rendered." The difficulty we have with this argument is that we know from petitioner's own testimony that he did not receive the 90,000 shares. We can only assume that the 90,000 shares promised to petitioner were a part of the 380,000 shares issued to petitioner and Austin as trustees. It makes little difference whether we view this as a true trust or as some type of escrow arrangement. In either event, petitioner has not proved that *271 he was entitled to withdraw the 90,000 shares without the approval of Austin and the acquiescence of the board of directors of Texas-Ohio, and all of the evidence of record indicates to the contrary. Petitioner, for example, testified that he insisted on there being some control of the dispersal and sale of stock issued to Austin and that it was for this reason that 380,000 shares were issued to himself and Austin as trustees. We find nothing inconsistent in our conclusion with respondent's admission "that, in 1951, petitioners sold shares of Texas-Ohio Gas Company stock for a net amount of $11,225.00." Petitioner's disposition individually of 25,000 shares in November or December of 1951, without objection by Austin or others, in order, as he testified, to induce Kidder, Peabody & Co. to invest in Texas-Ohio by reducing his interest in that company, is not evidence that he was free to dispose of the remaining 65,000 shares promised him. That petitioner was not immediately entitled to the beneficial ownership of all of the stock he eventually acquired is reasonably clear from the extent to which the intervening transactions altered the original quantities. The authorization of *272 the stock ultimately issued to petitioner was made by the board of directors in the following language: "[That] 50,000 shares of the original stock of the company be confirmed in Mr. Champion as of the date of his original agreement with the company, that is to say July/7, 1951, upon condition that Mr. Champion make no further claim to stock based upon said agreement * * *." The first unrestricted claim which petitioner had to any of the Texas-Ohio stock was thus in December 1951, when he sold the 25,000 shares to Kidder, Peabody & Co. This unrestricted claim was limited to 25,000 shares and the net gain realized on the sale, $11,225, which is all that respondent seeks to tax, is taxable to petitioners as ordinary income as compensation for services rendered. On April 4, 1952, petitioner purchased 5,000 shares from Texas-Ohio for 50 cents a share. He sold these shares for a net gain of $30,000 on April 9, 1952. Respondent determined that the net proceeds of the sale were determinative of their value when issued to petitioner and that petitioner had ordinary income of $30,000 from this transaction. Petitioner placed $27,500 of the proceeds of this sale in a special account. In *273 June 1952, Kidder, Peabody & Co. required him to deposit the $27,500 with Texas-Ohio. In August 1952, petitioner was permitted to withdraw the $27,500 in lieu of the receipt of 5,000 shares of stock. Petitioner contends that he had a $2,500 short-term capital gain on the April sale and that he received the $27,500 as "boot" on the exchange of stock acquired in July 1951 for similar stock. See sec. 112(c)(1), I.R.C. 1939. We have already determined that petitioner received no stock in July 1951. It follows that if petitioner received $27,500 from Texas-Ohio it was as compensation for services rendered and not as part of an exchange of stock. As to his $2,500 gain, petitioner has not shown that respondent erred in determining that the Texas-Ohio stock was as valuable on the day he purchased it as on the day it was sold. We therefore conclude that the gain realized by petitioner arose out of a bargain purchase which he made from Texas-Ohio as an employee of that company and that it represents additional compensation to him. Commissioner v. LoBue, 351 U.S. 243. Petitioner received $15,000 in May 1952 and testified that he gave nothing for it. He has produced nothing which *274 would tend to show that this $15,000 was anything other than ordinary income. The same result would follow even if we accepted respondent's theory that 3,000 of the shares, which petitioner expected to receive and did obtain in August 1952, were committed to be sold in May of that year and should be valued according to the sales proceeds received. Petitioner received as compensation 45,000 shares of Texas-Ohio stock on August 7, 1952. Respondent, after treating petitioner as having previously disposed of 3,000 of these shares, valued the remaining 42,000 at $4 per share. Respondent has shown that on August 8, 1952, Texas-Ohio stock was purchased by a broker for $3.75 and $4 a share and sold for $4.25. Petitioner has not shown a valuation of $4 per share to be erroneous and it is therefore sustained. Petitioner also received an option to purchase 10,000 shares at $1 each. He exercised this option on September 15, 1952, at a time when a broker made purchases of Texas-Ohio stock for $4.50, $5.125 and $5.25 a share and sales at $5.50 and $5.125. Respondent's determination that the fair market value was $4.875 per share has not been proved erroneous and the difference between this value *275 and petitioner's cost is taxable to him as compensation. Commissioner v. LoBue, supra.
As to all the valuation issues, the fact that the company's affairs were not as prosperous as the public apparently believed, would not, even if true, alter the results we have reached. Fair market value depends on the market and not on intrinsic worth. Estate of Millie Langley Wright, 43 B.T.A. 551, 555. Respondent disallowed a portion of a claimed travel and entertainment expense deduction for 1951 and all such expense for 1952. Petitioner has introduced no evidence that he paid any traveling expenses. His testimony in regard to the entertainment expenses was most vague, consisting of little more than that he spent half of his time out of town, entertained 5 to 14 persons in a group and expended $10 to $20 per person. Even if we were to accept petitioner's testimony as fact, it would be difficult to determine the amounts expended by him. Cf. Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540. However, petitioner admitted that the entertainment expenses arose out of his attempts to secure a permit from the Federal Power Commission and gas for Texas-Ohio. *276 Petitioner has not shown that these expenses were incurred in any trade or business in which he individually, as contrasted with the company, was engaged. Hal E. Roach, 20 B.T.A. 919. Respondent's disallowance must accordingly be sustained. Decision will be entered for the respondent. Footnotes
1. Mr. Justice Cardozo states: "Promoters of a corporation stand in a fiduciary relation to it to this extent at least, that they will be chargeable as trustees if they deal with it unconscionably or oppressively or in violation of a statute, unless the liability for such misconduct has been effectually released. * * *" [McCandless v. Furlaud, 296 U.S. 140, 156↩.]
2. "No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."↩